COURT OF APPEALS OF VIRGINIA


Present:   Judges Humphreys, Felton and Kelsey
Argued at Salem, Virginia


JIMMY D. HARRISON, SR.

                                                         OPINION BY
v.        Record No. 0897-03-3                  JUDGE ROBERT J. HUMPHREYS
                                                         JANUARY 6, 2004
TAZEWELL COUNTY DEPARTMENT
 OF SOCIAL SERVICES


              FROM THE CIRCUIT COURT OF TAZEWELL COUNTY
                          Michael L. Moore, Judge

          Kelly Combs Necessary (Dudley, Galumbeck, Necessary & Dennis,
          on brief), for appellant.

          Stephen E. Arey; Susan E. F. Henderson, Guardian *ad Litem* for the
          minor child (Stephen E. Arey, PC; Henderson & Fuda, on brief), for
          appellee.


        Jimmy D. Harrison, Sr. appeals from a decision of the circuit court terminating his

residual parental rights to his minor child, L.H.[1]  Harrison contends the circuit court erred in

ordering the termination because "undisputed evidence" proved that terminating contact between

Harrison and L.H. would be detrimental to L.H. and, therefore, not in her best interests.  Harrison

further argues that the court erred in ordering the termination because L.H. suffers from Down's

Syndrome and "is not considered competent to request that [Harrison's] rights not be terminated

even if she could request the same, and through termination, she will have no means to contact

her father to request that he assist her in her care that she may require as an adult."  For the

reasons that follow, we affirm the judgment of the circuit court.

_____

        [1] The record demonstrates that the termination proceeding at issue also concerned the
termination of L.H.'s mother's residual parental rights.  However, that portion of the proceeding
is not before us on this appeal.

I.  Background

On appeal of an action to terminate residual parental rights, we view the evidence in the light most favorable to the party prevailing below and afford the evidence all reasonable inferences fairly deducible therefrom.  The trial court's judgment, "when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it."

M. G. v. Albemarle County Dept. of Social Services, 41 Va. App. 170, 180-81, 583 S.E.2d 761, 766 (2003) (quoting Peple v. Peple, 5 Va. App. 414, 422, 364 S.E.2d 232, 237 (1988)) (other citation omitted).

On March 28, 2002, the Tazewell County Department of Social Services (the Department) filed a petition requesting that Harrison's residual parental rights to his daughter, L.H., be terminated.  The petition requested termination pursuant to Code § 16.1-283, referring to the foster care plan and petition (approved by the court on February 27, 2002) "as document[ing] termination . . . as being in the best interests of the child."

After a hearing on June 26, 2002, the Tazewell Juvenile and Domestic Relations District Court terminated Harrison's residual parental rights.  Harrison appealed that decision to the circuit court.[2]

During the circuit court hearing, Harrison testified that he separated from L.H.'s mother, Vicki Harrison Crabtree, in 1993, when L.H. was approximately three years old.  At the time of their separation, Crabtree and Harrison agreed that Harrison would take primary custody of L.H. Harrison maintained primary custody until August of 1999.  At that time, Harrison was convicted in federal court on a charge of possession of a firearm by a convicted felon.  While he was awaiting sentencing on the federal conviction, Harrison asked Crabtree to take custody of L.H.

---

[2] The record reflects that L.H., who was twelve years old at the time of the circuit court proceedings, suffers from Down's Syndrome.

Before Harrison was sentenced on the federal conviction, he was arrested on additional charges of distribution of cocaine, carrying a concealed weapon, and possession of controlled substance paraphernalia. Harrison remained incarcerated in relation to those charges throughout his subsequent trial in the Tazewell Circuit Court. He was sentenced on those convictions to serve eleven years and twenty-four months in the Bland Correctional Center, with six years suspended upon certain conditions. Harrison testified that his "expected" release date on the Virginia sentence was May of 2004. However, he acknowledged that, during the Virginia proceedings, he had been sentenced by the federal court to serve three years in federal prison in relation to his federal conviction for possession of a firearm. Due to his incarceration on the Virginia convictions, Harrison had not yet served the federal sentence. Thus, Harrison agreed that his "ultimate release date" "would probably be around 2007."

Harrison testified that, after his conviction on the Virginia charges, the court ordered that a presentence report be prepared in relation to those convictions. The report reflected that when Harrison was arrested on those charges, juveniles were found in his home smoking marijuana. In addition, the report stated that Harrison sold crack cocaine and cocaine from his home, that he had had a pattern of drug use for several years, that he smoked a half-an-ounce of marijuana per week, that he used a half-an-ounce of cocaine daily, and that he began selling cocaine in 1983.[3]

Harrison conceded that he used cocaine and marijuana in his home while L.H. resided with him there. Harrison claimed that he only sold the drugs, however, when L.H. was at school.

Harrison further testified that, for reasons unrelated to the matter at issue, the Department had offered L.H. various services while she was in his custody. Those services included infant stimulation services and speech therapy.

---

[3] Harrison testified that he was incarcerated on federal drug charges in "[19]84 or [19]85" and had already served his sentence related to those convictions.

Harrison stated that he maintained contact with L.H. while he was in prison, he wrote to her once or twice per week and sent pictures to her. He testified that he and L.H. had a "very loving bond." He stated that, in his opinion, severing that bond would "bother [L.H.] a lot" and would be "detrimental" to her.

Harrison claimed that he intended to care for L.H. when he ultimately got out of prison by making sure that she received the appropriate therapy and education. He further claimed that he had housing secured for them to live in and that he would be able to obtain his "VA" benefits, social security and his retirement from "Jewell Smokeless Coal, [sic] & Coke."

Crabtree testified that the Department removed L.H. from her custody on July 20, 2000. Crabtree acknowledged that shortly thereafter, she was also arrested on criminal charges relating to drug abuse, and ultimately convicted of four counts of "giving fraudulent prescriptions." She testified that the circuit court suspended her related prison sentence, and placed her on probation. During her probation, the Department entered several foster care plans pertaining to L.H. and offered services to both L.H. and Crabtree. Crabtree failed to comply with many of the conditions contained within the foster care plans and continued to abuse prescription pain medication. Accordingly, Crabtree did not regain custody of L.H.

After Crabtree tested positive on a routine drug screen, the trial court revoked her probation and ordered her to serve her underlying prison sentence. Crabtree testified that she was not scheduled to be released from prison until November of 2004.

Edwina Crawford, a child protective services supervisor with the Department, testified that she was present when L.H. was removed from Crabtree's care in July of 2000. She stated that the Department had received a call about problems at Crabtree's home. When Department workers arrived at Crabtree's home, they found Crabtree "unconscious on the couch." L.H. and

two of Crabtree's other children were in a bedroom, alone.[4]  Crawford observed that there were no linens on the beds in the home and that the mattresses smelled of urine.  She stated there was trash "all over the kitchen floor and empty beer bottles sitting on the counter and in the floor."  L.H. appeared unkempt as if she had not been bathed.

Crawford stated that it took two hours to revive Crabtree.  Crabtree looked bruised and swollen and seemed to have difficulty breathing, but she refused to go to the hospital.  Crabtree directed Crawford to a prescription bottle of Oxycontin.  Crawford observed that the prescription for sixty tablets had been filled the day before, but only two tablets remained in the bottle.

While speaking with Crabtree, Crawford observed L.H. playing with a lighter, biting the baby, spraying hairspray in the baby's mouth, grabbing the genitals and breasts of female Department workers, and trying to get pills out of their hands.  Crawford then removed L.H. and the other children from Crabtree's home.

Deborah Large, L.H.'s foster mother, testified that she was a "specially trained therapeutic foster" parent.  She stated that L.H. had been in her home for approximately two and a half years by the time of the hearing.  When L.H. first came to her home, L.H. did not know how to feed herself, or how to dress or bathe herself.  She stated L.H. did not talk, but would pull on people and would pull on women's breasts.  Large testified that she had also observed L.H. "tie a doll down in bed," and had observed her masturbating "in front of people."

Large stated that she sought medical help for L.H. after she arrived in her home and that she made sure L.H. received appropriate medication.  At the time of the hearing, Large stated that L.H. could dress herself, eat and drink properly, she could "spell some things," she could "read some," she could count, and she was well behaved.

---

[4] Crabtree had two other children, ages ten and two.  Harrison is not the father of those children.

Large also testified that Harrison wrote to L.H. once per week and that L.H. enjoyed receiving the letters. She stated that L.H. had visited with Harrison twice and that the visits had gone "very well." Large agreed that it "would bother" L.H. if she were forced to sever her bond with her father.

April Workman, L.H.'s special education teacher, testified that L.H. "does not deal with change very well." She stated that when L.H. began in her class, in August of 2002, she would bite and spit. However, L.H. was doing "wonderful" at the time of the hearing. She further stated that L.H. was "very happy and well taken care of in the home situation she [was] in at [that] time."

Other Department workers testified that, due to complaints about L.H.'s care unrelated to the ultimate removal, the Department began working with Harrison and L.H. as early as 1998 - prior to Harrison's arrests and incarceration. At that time, the Department offered services to both Harrison and L.H., but Harrison refused to take advantage of many of the services offered. The Department continued working with L.H. while Harrison was incarcerated, offering services to Crabtree and L.H. However, the Department offered no services to Harrison during his incarceration.

In closing argument, Harrison contended that his residual parental rights should not be terminated because L.H. is a Down's Syndrome child who "can't make her wishes known," because no services were provided to him while he was incarcerated, because he had maintained a relationship with L.H. and had a plan for her care upon his release, and because L.H. might not be able to seek him out if she wished to maintain a relationship with him.

The trial court ultimately ordered termination of Harrison's residual parental rights, finding:

> Mr. Harrison, I believe that you love [L.H.], which I . . . I can't
> understand why you continued to use drugs, sell drugs and abuse

drugs. Apparently, you were convicted in 1982, we're twenty (20) years past that and here you are still serving time for cocaine abuse. These children deserve better; [L.H.] deserves better than this. I can't help but wonder when you were offered in-home services, one of the reasons that you didn't accept them, sir, was because of what you were doing in your home; you didn't want people in there; that is what I suspect. But it's clear that you can't provide for her in the foreseeable future, not one (1) year, two (2) year[s], three (3) year[s], four (4) year[s] down the road. You're probably looking at a release date based on a fed time of more like May of 2008 would be more likely and [L.H.'s] going to be turning eighteen (18) soon, soon after that.

It's clear, sir, under 16.1-283(c) that without good cause you've been unable to provide for the child, to remedy the conditions that placed the child in foster care and you can't do that in the future because of the place that you find yourself. I hope that you can have a relationship with your child after she turns eighteen (18); she's going to need you, but she, also, is entitled to a better life; she's entitled to the hope of having an adoptive home that won't . . . that won't include drugs and drug abuse and jail time and letters from prison. She's entitled to better than that, and I hope she will get it. The Court will authorize that she continue in the custody of [the Department] and authorize that she be placed for adoption, as well.

The court memorialized its findings in a written order dated March 20, 2003. The court

stated as follows:

The court further finds that [Harrison], while he loves his daughter, [L.H.], continued to use and sell illegal drugs even after a conviction and incarceration in 1982, that these illegal activities resulting [sic] in his present incarceration in 1999, that he did not accept services, to include in home services, offered prior to his incarceration, that he is not able to provide for his daughter, [L.H.], for the foreseeable future due to his current incarceration, that he is unable in a reasonable period of time not to exceed twelve months from the date [L.H.] was placed in foster care to remedy substantially the conditions which lead to or required continuation of the child's foster care placement and that [L.H.] would benefit from permanency. It is accordingly determined by clear and convincing evidence that the residual parental rights of [Harrison] for his daughter, [L.H.], should be terminated pursuant to [Code] § 16.1-283(C). Said children [sic] are not fourteen years of age or older nor are they otherwise of an age of discretion.

Harrison signed the court's order, by counsel, noting:

> "Seen and objected to" on the grounds that the drug use was not stated correctly in that there was a long period of no drug use by [Harrison], and on the grounds that he chose not to accept services because he was unaware of the type of services offered.

## II.  Analysis

On appeal to this Court, Harrison contends the trial court erred in terminating his residual parental rights for two reasons.  First, because the record reflects "undisputed evidence that terminating contact between [Harrison] and his special needs daughter would be detrimental to [L.H.]."  Second, because L.H. suffers from Down's Syndrome, she "is not considered competent to request that [Harrison's] rights not be terminated even if she could request the same [sic], and t[h]rough termination, she will have no means to contact her father to request that he assist her in her care that she may require as an adult."[5]

We begin our analysis by recognizing that although Harrison raises two separate issues on appeal, it is clear from his brief and oral argument that he truly raises only one issue.  That issue is whether the trial court erred in determining that the Department presented sufficient evidence from which it could determine that termination of Harrison's parental rights was in L.H.'s best interests.  In support of his argument, Harrison contends that:  1) "ample" evidence proved it would not be in L.H.'s best interests to lose contact with Harrison; 2) due to L.H.'s condition, she "may not have the capacity to know that she may have a relationship with her father [once] she reaches adulthood"; and 3) the Department failed to provide him with services during his incarceration, and thus failed to demonstrate that the requirements for termination, pursuant to Code § 16.1-283(C)(2) were met.

---

[5] Harrison does not argue on appeal that the court should have deemed L.H. to be of "an age of discretion" pursuant to Code § 16.1-283(G).

Before turning to the merits of Harrison's argument, we note that the record reflects that Harrison raised no objection to the sufficiency of the evidence on these specific bases. However, because Harrison raised these arguments in his closing remarks before the bench, we will presume he "afforded 'the trial court an opportunity to rule intelligently on the issues presented'" prior to entry of its judgment. Lee v. Lee, 12 Va. App. 512, 515, 404 S.E.2d 736, 738 (1991) (noting that "[c]ounsel may meet the mandates of Rule 5A:18 in many ways," including by a motion to strike the evidence or by closing argument); see also Kaufman v. Kaufman, 12 Va. App. 1200, 1204, 409 S.E.2d 1, 3-4 (1991) (quoting Weidman v. Babcock, 241 Va. 40, 44, 400 S.E.2d 164, 167 (1991)). Accordingly, we will assume, without deciding, that Harrison properly preserved the issue and his related arguments for purposes of appeal.

Nevertheless, for the reasons that follow, we find the evidence presented below was sufficient to support the trial court's determination that termination, pursuant to Code § 16.1-283(C), was supported by clear and convincing evidence. Indeed,

> [a]lthough "'the rights of parents may not be lightly severed,'" Ward v. Faw, 219 Va. 1120, 1124, 253 S.E.2d 658, 661 (1979) (quoting Malpass v. Morgan, 213 Va. 393, 400, 192 S.E.2d 794, 799 (1972)), "trial courts are vested with broad discretion in making the decisions necessary to guard and to foster a child's best interests[.]" Farley v. Farley, 9 Va. App. 326, 328, 387 S.E.2d 794, 795 (1990).

M. G., 41 Va. App. at 187, 583 S.E.2d at 769. While we are mindful of the principle that "'[t]he termination of [residual] parental rights is a grave, drastic and irreversible action,'" Helen W. v. Fairfax County Dep't of Human Dev., 12 Va. App. 877, 883, 407 S.E.2d 25, 28-29 (1991) (quoting Lowe v. Dep't of Public Welfare of the City of Richmond, 231 Va. 277, 280, 343 S.E.2d 70, 72 (1986)), we "'presume[] [the trial court has] thoroughly weighed all the evidence [and] considered the statutory requirements.'" Logan v. Fairfax County Dep't of Human Dev.,

13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991) (quoting Farley, 9 Va. App. at 329, 387

S.E.2d at 796).

Code § 16.1-283 provides as follows, in relevant part:

> C.  The residual parental rights of a parent or parents of a child
> placed in foster care as a result of court commitment, an
> entrustment agreement entered into by the parent or parents or
> other voluntary relinquishment by the parent or parents may be
> terminated if the court finds, based upon clear and convincing
> evidence, that it is in the best interests of the child and that:
>
> *    *    *    *    *    *    *
>
> 2.  The parent or parents, without good cause, have been unwilling
> or unable within a reasonable period of time not to exceed twelve
> months from the date the child was placed in foster care to remedy
> substantially the conditions which led to or required continuation
> of the child's foster care placement, notwithstanding the
> reasonable and appropriate efforts of social, medical, mental health
> or other rehabilitative agencies to such end.  Proof that the parent
> or parents, without good cause, have failed or been unable to make
> substantial progress towards elimination of the conditions which
> led to or required continuation of the child's foster care placement
> in accordance with their obligations under and within the time
> limits or goals set forth in a foster care plan filed with the court or
> any other plan jointly designed and agreed to by the parent or
> parents and a public or private social, medical, mental health or
> other rehabilitative agency shall constitute prima facie evidence of
> this condition.  The court shall take into consideration the prior
> efforts of such agencies to rehabilitate the parent or parents prior to
> the placement of the child in foster care.

Code § 16.1-283(C)(2).[6]

Thus, to grant the Department's prayer for termination pursuant to Code

§ 16.1-283(C)(2), the trial court was required to find by clear and convincing evidence (1) that

termination was in the best interests of L.H.; (2) that the Department offered "reasonable and

---

[6] We note that the trial court ordered the termination pursuant to "Code § 16.1-283(C)," but did not further specify which subsection it relied upon.  Observing that the content of the court's order parallels the requirements set forth in Code § 16.1-283(C)(2), we presume that the termination was ordered pursuant to Code § 16.1-283(C)(2).  Neither party contends otherwise.

appropriate" services to Harrison to help him substantially remedy the conditions which led to or required continuation of L.H.'s foster care placement"; and 3) that, despite those services, Harrison failed, "without good cause," to remedy those conditions "within a reasonable amount of time not to exceed twelve months from the date the child was placed in foster care." Code § 16.1-283(C)(2).

Although it is true that both Large and Harrison testified that L.H. would be upset if Harrison's parental rights were terminated, the evidence clearly supported the trial court's decision that termination was in L.H.'s best interests.

> In determining what is in the best interests of the child, a court must evaluate and consider many factors, including the age and physical and mental condition of the child or children; the age and physical and mental condition of the parents; the relationship existing between each parent and each child; the needs of the child or children; the role which each parent has played, and will play in the future, in the upbringing and care of the child or children; and such other factors as are necessary in determining the best interests of the child or children.

Barkey v. Commonwealth, 2 Va. App. 662, 668, 347 S.E.2d 188, 191 (1986).

The evidence in this case demonstrated that L.H. had not been in Harrison's care since 1999. Although she apparently loved her father, no evidence proved that she possessed a bond with him such that it would jeopardize her emotional and/or physical well-being if broken. To the contrary, the evidence proved that since L.H. had been in foster care, she had received a level of medical care and other services, including a structured and stable therapeutic home environment, that had allowed her to improve her basic living skills, as well as to make great strides in her educational environment.

In addition, we have long held that "[i]t is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his responsibilities." Kaywood v. Halifax County Dep't of Social Servs., 10 Va. App.

535, 540, 394 S.E.2d 492, 495 (1990). Although Harrison claims to have a plan for taking care of L.H. when he is finally released from prison, the record reflects that his release will not take place for several years - most likely, just before L.H. turns eighteen. While we have held that "long-term incarceration does not, *per se*, authorize termination of parental rights," we have recognized that "it is a valid and proper circumstance which, when combined with other evidence concerning the parent/child relationship, can support a court's finding by clear and convincing evidence that the best interests of the child will be served by termination." Ferguson v. Stafford DSS, 14 Va. App. 333, 340, 417 S.E.2d 1, 5 (1992).

Moreover, we find no basis for requiring the trial court to place more credibility in Harrison's proposed plans for the future than was warranted by his past actions. Indeed, the evidence proved that Harrison had been arrested and imprisoned for drug offenses in the early 1980's. Nevertheless, Harrison began using drugs once again, on a consistent basis, sometime after he had served that sentence. The evidence proved that Harrison not only used drugs, but also sold drugs from his home and allowed minors to use drugs while in his home. Harrison engaged in these activities while L.H., a special needs child, was in his custody and care.

We further decline Harrison's invitation to create a "special exception" to the best interests analysis for parents of special needs children. Indeed, we find no authority supporting such an exception, nor has counsel provided any such authority. Instead, it is clear that L.H..'s condition was merely another factor for the court to consider when proceeding through the requisite statutory analysis and making its determination pertaining to L.H.'s best interests. See Barkey, 2 Va. App. at 668, 347 S.E.2d at 191. The fact that L.H. may or may not be able to maintain a relationship with her father after she turns eighteen was, thus, not determinative of the trial court's analysis. Otherwise the trial court would have been denied the opportunity to evaluate the overall best interests of L.H. *at the time of the hearing and for the foreseeable future*

*of her minority* – an idea that is plainly not in keeping with the statutory mandate, nor the paramount consideration of the trial court in such matters. See id.; see also Roanoke City Dept. of Soc. Servs. v. Heide, 35 Va. App. 328, 337, 544 S.E.2d 890, 894 (2001). Thus, we conclude that this record contains clear and convincing evidence supporting the trial court's decision to terminate Harrison's parental rights under Code § 16.1-283(C)(2).

Finally, although Harrison correctly notes that Code § 16.1-283(C)(2) does not negate the Department's responsibility to offer him "reasonable and appropriate" services, we have recognized that

> [w]e must interpret the statutory mandate in accordance with the language chosen by the legislature. "Reasonable and appropriate" efforts can only be judged with reference to the circumstances of a particular case. Thus, a court must determine what constitutes reasonable and appropriate efforts given the facts before the court.

Ferguson, 14 Va. App. at 338, 417 S.E.2d at 9. Accordingly, we find no merit in Harrison's contention on appeal that Code § 16.1-283(C)(2) required the Department to offer him services during his incarceration. It would be patently unreasonable to require the Department, under such circumstances, to continue to offer services. Indeed, as reflected by the facts of this case, when L.H. was removed from Crabtree's home and placed in foster care, Harrison was in the long-term custody of the Department of Corrections. Thus as long as he was incarcerated, the Department would have had no avenue available to offer Harrison services aimed at assisting him in regaining custody of the child.

Notwithstanding this, the record reflects that the Department in fact offered Harrison services before he became incarcerated and before L.H. was placed in foster care. However, Harrison refused to take advantage of those services. Further, the Department continued to offer services to L.H., as well as to Crabtree, and to communicate with Harrison as to his daughter's placement situation. Considering these circumstances, we find no error in the trial court's

determination that the Department "reasonably and appropriately" carried out its charge as required by the statute.  See Harris v. Lynchburg Div. Soc. Serv., 223 Va. 235, 242, 288 S.E.2d 410, 414 (1982) (holding that a parent will not be allowed to use the circumstance of incarceration as reason to excuse prior neglectful treatment of children).

For these reasons we affirm the final order terminating Harrison's parental rights pursuant to Code § 16.1-283.

Affirmed.